## Case No. 17,802.
## WILSON v. The ENVOY.
[8 Leg. Int. 10; [1] 1 Phil. 138.]
District Court, E. D. Pennsylvania.    Jan. 8, 1851.

COLLISION—SCOW WITH VESSEL AT ANCHOR.

[A heavily laden scow allowing herself to be cast off by a steam tug, while in motion in the tideway, and with a sheer towards the shore, in a crowded harbor, stands as her own insurer against the hazards of a collision with an anchored vessel; and, if the scow is sunk by striking against the stem of such a vessel, it can be no ground of liability on the part of the latter that her anchor may have been hanging atrip, contrary to good seamanship, so as to cause increased damage to the scow.]

KANE, District Judge.  There is no need of discussing the conflicting evidence of this case in order to decide it; the conceded facts are quite enough.  A section-scow, made up of two rectangular boxes held together by a shifting hinge, was bringing some sixty tons of iron to one of the wharves on the Delaware in tow of a steam tug; and, according to the reprehensible practice of our tow masters, she was cast adrift in the tide-way, with a sheer towards the shore.  Utterly unable to take care of herself, she was driven by the tide and wind against the ship Envoy, and sunk.  Her owners claim damages, because they say the disaster would not have occurred, or would, at least, not been fatal, if the scow had not encountered the flukes of the Envoy's anchor, which was hanging from her bow below the water, as they contend, improperly.

The respondents controvert both fact and inference.  They say the Envoy was about to shift her position at the wharf, and had raised her anchor for that purpose, but that it was not under water, though it might have been so without contravening either law or usage, and that, whether it was so or not, the scow could not have escaped destruction from the collision, which her management or want of management invited.  Of the probability of this last inference, my experience in cases of this sort has convinced me abundantly.  A heavily laden scow like this, driven by tide and wind, must go to the bottom almost as a matter of course, if she comes against the bows of a ship at anchor.  But my decree will not rest on that ground.  I

hold it to be the law, that a vessel which is purposely thrown adrift in a crowded thoroughfare stands her own insurer against the hazards of collision.  The principle, which requires of every vessel that she shall use her best efforts to avoid running foul of another, has its very strongest illustration in just such a case as this.  Nor do I think it needful to inquire, what might not perhaps be a question of difficulty, though one to which no evidence has been addressed, whether the custom of carrying the anchor atrip as it is asserted the Envoy's was, instead of catting it, is not seaman-like and lawful.  For I do not understand the admiralty rule that when both parties are to blame, they shall bear the damages jointly, as having application to all sorts of faults alike.  I understand the fault, of which that rule is predicated, to be such an one as induces or contributes to the collision.  I do not suppose it to be the law, that the party aggressor can be admitted to set off against the wrong he has done to another, the injuries which were consequent on it to himself, nor even to claim a sort of hotch-pot adjustment of the two sets of grievances, because he would have suffered less if the party assailed had conformed more exactly to rules.

I therefore dismiss the libel with costs; regarding the libellants as the party causing the collision, and the mode of carrying the respondent's anchor, even if improper, as contributing only incidentally to the damage which the libellants have brought on themselves.  Decree accordingly.